IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| POWERTECH INDUSTRIAL CO., LTD., a Taiwan company,<br><br>    Plaintiff,<br><br>v.<br><br>360 ELECTRICAL, LLC, a Utah limited liability company,<br><br>    Defendant. | **ORDER AND MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART PARTIAL MOTION TO DISMISS**<br><br>Case No. 2:23-cv-00675-TC<br><br>Judge Tena Campbell |

Before the court is a Partial Motion to Dismiss (ECF No. 14) filed by Defendant 360 Electrical, LLC (360 Electrical). In an Amended Complaint (ECF No. 17), Plaintiff Powertech Industrial Co., Ltd. (Powertech) asserts five causes of action against 360 Electrical: 1) breach of contract; 2) breach of the implied covenant of good faith and fair dealing; 3) unjust enrichment; 4) conversion; and 5) misappropriation of trade secrets.[1] 360 Electrical moves to dismiss the conversion claim, arguing that this claim is barred by the application of Utah's economic loss doctrine. 360 Electrical further moves to dismiss the misappropriation claim, maintaining that Powertech has not stated a claim for misappropriation of trade secrets under Utah law. For the following reasons, the court agrees that the conversion claim should be

---

[1] In its original Complaint (ECF No. 2), Powertech also asserted a sixth cause of action for declaratory judgment. Because Powertech no longer brings that claim as a separate cause of action in its Amended Complaint, the court will not address that portion of 360 Electrical's motion asking the court to dismiss the declaratory judgment claim.

1

dismissed. But the court finds that Powertech has adequately pled a misappropriation of trade secrets claim at this stage of the proceedings.

## BACKGROUND

Powertech is a Taiwan-based manufacturing company that specializes in surge protectors and other power management products. (Am. Compl. ¶ 6.) 360 Electrical is a Utah-based company that sells wall outlets, power strips, and other electrical products. (Id. ¶ 7.) Around 2008, the two companies began working together to develop 360 Electrical's line of rotating wall outlets and surge protector products (including, as relevant in this lawsuit, the "Core Line" products and the "Revolve 2.4" and "Revolve 3.4" products). (Id. ¶¶ 8–9, 46–47.)

Powertech created tooling that is used to produce parts of 360 Electrical's Core Line products, such as the top casing and bottom casing. (Id. ¶¶ 46–48.) Powertech incurred startup costs from this product development and alleges that the tooling is specifically used to manufacture the Core Line products. (Id. ¶¶ 46–47.) Since at least 2020, the parties have disputed whether Powertech or 360 Electrical owns the tooling. (Id. ¶¶ 49–51.)

The parties' dispute grew in scope on January 20, 2022, when 360 Electrical emailed Powertech asserting that a number of Revolve 2.4 and Revolve 3.4 products—specified in Purchase Order (PO) 1444 and PO 1474—did not meet 360 Electrical's color specifications. (Id. ¶ 13.) Both POs at issue contained the following contractual provision in their Terms and Conditions:

> Should 360 discover any defects in quality, once the goods have arrived to 360's warehouse partner facility or to any of 360's retail customers, 360 will immediately report the defect. At 360's sole discretion, and within twelve (12) months from the Agreed-Upon Ship Date, a request to Powertech for Reimbursement or Replacement for all or a portion of the associated product in 360's possession may be made. Once such a request is made, Powertech and 360 will negotiate and confirm whether Powertech shall replace at its sole cost and expense, including shipping, any products that fail to comply with the Product

2

> Warranty. In lieu of replacement of product that fails to comply with the Product Warranty above, 360 and Powertech may negotiate that Powertech reimburse 360 or provide a warranty credit to 360 equal to the price of all affected products.

(Id. ¶ 12; Purchase Order Terms & Conditions § 3.3, Exs. A & B to Pl.'s Mot. Dismiss, ECF Nos. 17-1 & 17-2.)

After discovering the nonconforming products, 360 Electrical inspected its existing products and determined that all the Revolve family of products were nonconforming. (Am. Compl. ¶ 17.) During the subsequent year, the parties were unable to reach an agreement about how to resolve the conflict and both parties accuse each other of acting in bad faith. (Id. ¶¶ 63–69; Am. Countercl. ¶¶ 373–659, ECF No. 35.)

To summarize, Powertech asserts that 360 Electrical failed to negotiate as specified by the relevant POs, that it failed to timely report the nonconforming products, that it inappropriately withheld payments, and that it inappropriately applied a $800,000 credit on products for which 360 Electrical claimed there was a warranty issue, as well as a $400,000 credit for additional products—all of which has amounted to an outstanding debt of $1.2 million in unpaid invoices. (Am. Compl. ¶¶ 59–60, 62, 68.)

In an Amended Counterclaim, 360 Electrical maintains that Powertech did not have quality control processes in place, that Powertech knowingly shipped nonconforming products, that the parties negotiated at length (and did at one point negotiate a credit agreement), that Powertech has not picked up any of the defective products and that those products are being stored at 360 Electrical's expense, and that Powertech refuses to allow inspection of the tooling, which may be defective. (Am. Countercl. ¶¶ 402, 406, 412, 421, 434, 570–76, 673.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires dismissal if the complaint or other pleading fails to state a claim upon which relief can be granted. The court must accept all well-pled factual allegations as true and construe them in the light most favorable to the nonmoving party. Strauss v. Angie's List, Inc., 951 F.3d 1263, 1267 (10th Cir. 2020). But that rule does not apply to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a [party] must offer specific factual allegations to support each claim." Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "[T]o withstand a motion to dismiss, a [pleading] must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

## ANALYSIS

### I. Conversion

Powertech asserts that 360 Electrical converted many of the manufactured products when 360 Electrical failed to pay its outstanding invoices and "sold some of those products to customers in violation of its independent duty to Powertech to safeguard products subject to the parties' dispute." (Am. Compl. ¶ 75.) 360 Electrical argues that this claim is barred by the economic loss doctrine.

The relevant branch of the economic loss doctrine under Utah law applies when there is a contract between the parties. It declares that "when a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort." HealthBanc Int'l, LLC v. Synergy Worldwide, Inc., 435

P.3d 193, 196 (Utah 2018) (citing Reighard v. Yates, 285 P.3d 1168 (Utah 2012)).  In HealthBanc, the Utah Supreme Court clarified that the economic loss rule applies "where a party's tort claims are entirely duplicative of its contract claims."  Id. at 198.  The Court reasoned that it is not a court's role to import tort remedies into a contractual dispute, thereby making the contract stronger than the contract the parties negotiated.  Id.

The court agrees that the economic loss doctrine bars Powertech's conversion claim here because Powertech's breach of contract claim overlaps entirely with its conversion claim.  Under the relevant POs, Powertech had a duty to manufacture and ship certain products; 360 Electrical had a duty to pay for those products.  (See ECF No. 17-1 & 17-2.)  Powertech asserts that 360 Electrical had an independent duty to refrain from selling products to customers and distributors when those products were the subject of a payment dispute.  (Compl. ¶¶ 75, 77.)  But the duty to pay was contractual, as were any expectations negotiated between the parties about how to handle products that were the subject of a dispute.  The court is similarly unconvinced that any decision by 360 Electrical to deduct disputed amounts from a PO separate from the PO for the allegedly non-conforming projects converts this action from a contractual dispute to a tort. "Where the contract terms contain the grounds for the tort claim, we see no reason to conclude that recovery under contract law is insufficient[.]"  HealthBanc, 435 P.3d at 197.

Powertech relies on two cases that are factually distinct.  In BC Technical, Inc. v. Ensil Int'l Corp., which was decided a decade before the Utah Supreme Court issued its decision in HealthBanc, the Honorable Ted Stewart allowed a claim for conversion under Utah law where a computer repair company not only failed to perform the contractually agreed-upon repairs, but also refused to return the computer equipment.  No. 2:02-cv-700-TS, 2008 WL 2803407 (D. Utah July 18, 2008).  That alleged theft was distinct from any contractual agreement between

5

the parties because the plaintiff never contemplated that the defendant would retain ownership over the circuit boards after they were repaired. Here, the parties expected that 360 Electrical would sell the products to customers and distributors after receiving them from Powertech.

A second action cited by Powertech involved the sale of 43 cars by an auction house to a car dealership. AAAG-California, LLC v. Kisana, 439 F. Supp. 3d 1265, 1269 (D. Utah 2020). In keeping with the parties' past practice, the auction house retained title to the cars until the dealership paid for them. Id. at 1270. But unbeknownst to the auction house, and in coordination with the dealership, one of the auction house employees stole the titles to the cars from a safe and provided them to the dealership, who then claimed ownership over the cars and argued that only contractual remedies were available to the plaintiff. Id. at 1271. The Honorable Howard C. Nielsen found that the theft of the titles was a separate act not contemplated by the parties' agreement and held that the dealership had an independent duty not to steal the titles. Id. at 1276 (recognizing that the economic loss doctrine does not bar tort claims where the "basis for [those] claims is distinct and separable from the basis for the contract claims" (quoting HealthBanc, 435 P.3d at 196)). The conversion claim concerned the theft of the titles—not whether the dealership sold the disputed inventory to consumers while the dispute over payment remained pending. Powertech alleges no similar independent act of theft here.

Powertech pleads its conversion claim in the alternative and argues that it would be premature to dismiss the claim at this stage of the proceedings, citing ClearOne Comms., Inc. v. JAS Forwarding, No. 29-cv-450-TS, 2009 WL 3248120, at *3 (D. Utah Oct. 7, 2009) and GEA Power Cooling Sys., LLC v. Bechtel Power Corp., No. 09-cv-02051, 2010 WL 1241290, at *1 (D. Colo. Mar. 18, 2010). But ClearOne concerned a claim for promissory estoppel, a type of quasi-contract claim, and the court held merely that it was "well settled under both the Federal

6

Rules of Civil Procedure and Utah law that contract and quasi-contract claims may be plead [sic] in the alternative." ClearOne Comms., 2009 WL 3248120, at *4. In GEA Power Cooling, the court allowed the plaintiff to plead a breach of contract claim and a conversion claim in the alternative, but provided no analysis about whether those claims were entirely duplicative. 2010 WL 1241290, at *1. In any event, the court applied Colorado law in GEA Power Cooling (see id.) and the Utah Supreme Court expressly disclaimed reliance on Colorado's application of the economic loss rule in HealthBanc. See HealthBanc, 435 P.3d at 197 (disagreeing with the Colorado Supreme Court that "there is an important distinction between failure to perform the contract itself, and promises that induce a party to enter into a contract in the first place").

Applying Utah law, this court has previously allowed a plaintiff to assert tort claims in the alternative to contract claims. See Vincent T. Taylor & Assocs., Inc. v. Mgmt. Training Corp., No. 2:22-cv-527-TC, 2023 WL 6377600, at *6 (D. Utah Sept. 29, 2023). But it has done so only where the plaintiff alleged a duty independent of the contract that could support that tort claim. Id. Where a plaintiff has not demonstrated an independent duty, "the contractual relationship controls, and parties are not permitted to assert actions in tort." HealthBank, 435 P.3d at 196 (citation omitted) (emphasis added). Because the court finds no independent duty here, the court dismisses Powertech's conversion claim.

## II. Misappropriation of Trade Secrets

To state a claim for misappropriation of trade secrets under the Utah Trade Secrets Act (UTSA), Utah Code Ann. § 13-24-1 et seq., or the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1831 et seq., Powertech must allege: 1) it is the owner of a trade secret; 2) it took reasonable measures to protect the trade secret; and 3) 360 Electrical acquired, disclosed, or used the trade secret improperly in a manner that harmed Powertech. CDC Restoration & Const., LC

v. Tradesmen Contractors, LLC, 274 P.3d 317, 323 (Utah Ct. App. 2012); see also Total Quality Sys. v. Universal Synaptics Corp., 679 F. Supp. 3d 1196, 1210 (D. Utah 2023) (noting that "[t]he elements of a claim for trade secret misappropriation under the DTSA and UTSA closely resemble each other" and listing similar elements to establish a claim under the DTSA).

Both the UTSA and the DTSA define "trade secret" broadly. Under the UTSA,

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Utah Code Ann. § 13-24-2(4). And the DTSA defines a trade secret as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, fomulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

Taken in the light most favorable to Powertech, the tooling is sufficiently specific to 360 Electrical's products and not generally known to others to fit the definition of a "trade secret." Powertech alleges that a "proprietary design diagram" was specifically engineered for the "internal structure of the 360 products." (Am. Compl. ¶ 84.) Indeed, that specificity is likely one reason why 360 Electrical wants the tooling returned and has filed a counterclaim against

Powertech stating that "Powertech has unlawfully retained 360 Electrical's product tooling, designs, engineering, and certifications." (Am. Countercl. ¶ 721.)

360 Electrical argues that Powertech did not take reasonable measures to protect the trade secret. But Powertech alleges that it took the following efforts to limit the disclosure of the proprietary designs and design process: "Powertech stored information regarding these designs and overall processes on secure servers and limited access to only necessary individuals as set forth above." (Am. Compl. ¶ 86.) To the extent Powertech shared this information with 360 Electrical, it did so "on a confidential basis" and "with the understanding that 360 Electrical would not share these designs with Powertech's competitors." (Id. ¶¶ 52, 85.) Taken as true, these assertions are sufficient at this stage of the lawsuit to demonstrate reasonable measures. 360 Electrical cites no cases suggesting that the parties were required to sign a confidentiality agreement to demonstrate reasonable measures to protect a trade secret.

Finally, the court finds that Powertech has pled the third prong of a trade secrets claim because Powertech alleges that 360 Electrical has been working with a new manufacturer, Goodwin Industrial Corporation, Ltd. (Goodwin), to make its products and that Goodwin recently filed a patent for a product design that is virtually identical to the tooling developed by Powertech. (Am. Compl. ¶¶ 87–89.) Given these allegations, Powertech has adequately alleged that 360 Electrical improperly disclosed the trade secret to a competitor.

Because Powertech has adequately pled the three elements of a claim for misappropriation of a trade secret, the court denies 360 Electrical's request to dismiss this claim.

## ORDER

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART the Defendant's Partial Motion to Dismiss (ECF No. 14). The court dismisses Powertech's claim for

9

conversion but allows Powertech to pursue its claim for trade secret misappropriation.

DATED this 17th day of September, 2024.

BY THE COURT:

Tena Campbell
United States District Judge